OPINION OF THE COURT
Diane A. Lebedeff, J.
This litigation springs from plaintiffs’ investments in several limited partnerships under common management, all of which involved shopping center sites and were similarly structured as tax shelters. The catalyst for the suit was a determination by the Internal Revenue Service (the IRS) that plaintiffs had claimed improperly high interest deductions. The IRS assessed plaintiffs for underpayment of taxes plus interest, computing interest at a penalty rate applicable to substantial understatements attributable to tax-motivated transactions under section 6621 (c) (3) of the Internal Revenue Code (26 USC). Plaintiffs here claim Price Waterhouse, the accounting firm, used an improper method to calculate the deductions, and seek recoupment of interest and legal expenses.
Price Waterhouse moves to dismiss the complaint pursuant to CPLR 3211 (a) (7). In addition to urging that plaintiffs lack standing, Price Waterhouse argues that all four causes of action, of which two sound in negligence and two in professional malpractice, are barred by applicable Statutes of Limitations.
This case presents a novel issue relating to the limitations period to be applied to claims relating to Federal income tax preparation. The complaint contains class action allegations but no class has yet been certified. Accordingly, the court treats the issues raised as limited to the individual plaintiffs.
UNDERLYING FACTS
Price Waterhouse was hired by the partnerships to conduct annual audits and to prepare the partnerships’ tax returns and K-l’s for the tax years 1980 through and including 1987. Price Waterhouse regularly prepared for each limited partner a K-l Schedule (K-l), an information return entitled "Partner’s Share of Income, Credits, Deductions, Etc.” The K-l’s reported each partner’s pro rata share of the partnership’s *868 income and expenses, including interest. The last K-l was prepared in February 1988. Deficiencies in the audit aspect of Price Waterhouse’s work are not alleged.
Apparently from the inception of the partnerships, Price Waterhouse used a method of interest computation called the Rule of 78’s. The Rule of 78’s allocates greater interest in the early years and lesser interest in the later years in the life of a debt. As a general description, under this method, the amount of interest is computed by multiplying the total interest payable over the life of the indebtedness by a fraction, of which the numerator is the number of periods remaining and the denominator is the sum of the digits in the number of periods comprising the term of the indebtedness.
In 1983, the IRS issued Revenue Ruling 83-84, which held that interest deductions based on the Rule of 78’s would not be allowed on any amount "in excess of the amount of the economic accrual of interest.” Nonetheless, Price Waterhouse continued to utilize the Rule of 78’s in its annual computations for these partnerships. The complaint alleges that Price Waterhouse discontinued the use of the Rule of 78’s for all other similar partnerships, but not for the partnerships involved here.
Price Waterhouse asserts that continuation of the use of the Rule of 78’s resulted from its reliance upon an opinion of the partnerships’ tax counsel dated December 1983 which consisted of 10 single-spaced pages. By a letter issued in March 1984, relevant to the 1983 tax year, Price Waterhouse advised the limited partners: "Interest expense deductions have been reported * * * on the Rule of 78’s method * * * It is * * * in accord with the existing case law and Revenue Rulings in effect at the time the transaction was entered into * * * [W]e have been furnished with an opinion of [the partnerships’] tax counsel to the effect that it is more likely than not that the interest deductions, as reported, will be upheld if challenged by the IRS based on research which indicates that the Commissioner cannot properly assert that Revenue Ruling 83-84 has retroactive effect. Our firm has relied on the opinion in preparing the 1983 Partnership Tax Return.” The above letter was referred to in Price Waterhouse brief cover letters for the K-l’s for the 1984 through 1988 tax years. An updated opinion of the partnerships’ tax counsel was issued in March 1985, consisting of 16 single-spaced pages, which contained a new analysis section including the view that litigation would be probable. This second letter was also referred to in subsequent *869 Price Waterhouse letters. The Price Waterhouse letters for 1987 and 1988 mentioned that the substantial underpayment penalty had been increased from 10% to 25%.
By February of 1988, the partnerships fell into three groups, with some having received preliminary deficiency notices from the IRS, some being subject to settlement negotiations without such letters, and some escaping attention. The earliest preliminary deficiency notices to the partnerships were issued in 1985. The IRS scrutiny related to a number of issues including the propriety of the continued use of the Rule of 78’s.
The legal issue was ultimately resolved in favor of the IRS’s position by a United States Tax Court decision in an unrelated case in December 1988. In that decision, Prabel v Commissioner of Internal Revenue (91 USTC 1101, affd 882 F2d 820 [3d Cir 1989]), the Tax Court concluded that the Rule of 78’s had never been viewed as a proper treatment for anything other than a short-term loan, rendering any attack on the retroactivity of the Revenue Ruling irrelevant. The court unequivocally stated that tax advisors had no legal or accounting authority to justify use of this method of computation for long-term loans either before or after the Revenue Ruling. Following this stinging assessment of their argument, the partnerships settled their appeals.
A group of investors commenced two Federal class actions against the partnerships and additional defendants, which were reportedly settled before Judge Platt of the Eastern District in February 1990, with the plaintiffs receiving approximately $40 million. There, the claims against Price Water-house apparently were discontinued without prejudice.
This action was commenced on April 10, 1990. The complaint requests damages equal to interest and legal fees paid in relation to tax years 1983 through 1988.
STANDING
Price Waterhouse attacks plaintiffs’ standing to sue, arguing that they were engaged by the partnerships and thus owed no duty of care to plaintiffs, the limited partners. This contention must be rejected.
Generally, even if an accounting firm is engaged solely by a limited partnership, the limited partners have standing to sue for breach of a duty of care owed directly to them by the accounting firm if there is "a relationship so close as to approach that of privity” (Credit Alliance Corp. v Andersen & *870 Co., 65 NY2d 536, 546 [1984]). This complaint, upon its face, makes adequate allegations to satisfy the specific three-prong test held to be applicable by the Court of Appeals, which is as follows: "(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants’ understanding of that party or parties’ reliance” (supra, at 551). The "like privity” relationship and three-prong standard were held applicable to a claim of limited partners against an accountant engaged by general partners in White v Guarente (43 NY2d 356 [1977]), in relation to a cause of action for negligence, "the gravamen of which [was] for professional malpractice” (43 NY2d, at 359). In addition, the pleading of the delivery of Price Waterhouse letters and forms to the plaintiffs is an adequate allegation of a legally cognizable direct relationship or bond between the parties (compare, Security Pac. Bus. Credit v Peat Marwick Main & Co., 79 NY2d 695 [1992]).
Based upon the foregoing, the standing argument is found to be without merit.
UNTIMELINESS
Price Waterhouse asserts that "virtually all” of plaintiffs’ claims are barred by the applicable Statutes of Limitations. Because the issue is actually more complicated than it might seem to be, the initial step must be to define the relevant actions. The claims relating to the three out-of-State plaintiffs will be addressed at the close of this decision.
For New York plaintiffs, claims of negligence and professional malpractice are governed by a Statute of Limitations of three years (CPLR 214 [4], [6]). As generally applicable, a cause of action in negligence accrues from the date of the injury and a cause of action for professional malpractice accrues upon the performance of the work by the professional (Fleet Factors Corp. v Werblin, 114 AD2d 996, 997 [2d Dept 1985]).
Here, Price Waterhouse last submitted K-l forms to the plaintiffs in February 1988, and this action was commenced on April 10, 1990. Hence, three years have not elapsed in relation to the last item of work performed for most plaintiffs. If this *871 mechanical test were used, Price Waterhouse concedes that claims relating to 1988 are not stale under a Statute of Limitations computation.
However, two refinements to this method of computation exist: a more specialized test applicable to Federal tax preparers and a continuous treatment rule. Despite the general precept that a motion to dismiss should not be used to prune a cause of action if any portion of the cause of action is valid, counsel have requested that the court determine, to the extent permitted by the record, which claims are time barred in order to limit discovery and provide some guidance as to a possible class action. Given that these issues are issues of law based upon undisputed facts, for reasons detailed more fully below, the court will allow counsel to chart their procedural course on this motion to dismiss and will address, as a matter of law, the portion of the claims which are not stale.
THE ATKINS TEST
Of primary consideration is a more specialized rule which has been utilized in every State to consider the issue of when the Statute of Limitations commences to run on a tort claim against an accountant or tax attorney subject to a claim of wrongful conduct leading to the imposition of an additional Federal tax assessment. Atkins v Crosland (417 SW2d 150 [Tex 1967]) was the first case to confront the issue and adopt a rule which commences the running of a Statute of Limitations at the time of an IRS administrative action. There, the date of issuance of the actual Federal tax assessment, the point at which the taxpayer legally owed a debt, was adopted as the reference point. This case apparently presents the first instance in which a New York court has considered adoption of an Atkins test for New York claims.
In considering the issue, the court bears in mind that "[w]hen limitations begin to run ’depends on a nice balancing of policy considerations’ ” (Martin v Edwards Labs., 60 NY2d 417, 425 [1983], quoting Victorson v Bock Laundry Mach. Co., 37 NY2d 395, 403 [1975]). It is significant here that Federal tax return issues involve a specialized area of accounting and law, in which accountants and lawyers are, or must be held to be, aware that the IRS must assess a deficiency within three years from the date the tax return is filed (Internal Revenue Code [26 USC] § 6501). Accordingly, potential defendants must anticipate that three years will probably pass between any *872 wrong and the time when the plaintiff might possibly discover the wrong and the maturation of harm, and, additionally, that a wrong may never draw the IRS’s attention, so that the Atkins test is in accord with the understanding of any defendant and does not subject a defendant to an ancient obligation.
The fact that the Atkins test is a relatively uniform rule with growing nationwide adherence also weighs heavily in favor of its adoption. There may be few better examples than this case of the wisdom of following a prevalent test, for here, a national accounting firm prepared tax forms for taxpayers residing throughout the country, which will undoubtedly call into play the principles of comity embodied in New York’s borrowing statute (CPLR 202). Predictability and commercial certainty in relation to Federal tax return obligations are clearly in the interest of entities which perform services with nationwide scope.
Further, the Atkins test encourages potential plaintiffs to wait to sue an accountant until subjected to a demonstrable wrong and injury. Accordingly, it protects Federal tax preparers from the prejudice of needless litigation expense on suits which must later be abandoned because no damage ensued, after occasioning an entirely wasted investment of court resources. This aspect of the rule is evident here, in that certain tax years computed with the Rule of 78’s were not subject to IRS scrutiny and thus no wrong is urged as to them.
Turning to the general legal rule, in Atkins v Crosland (supra), the Texas Supreme Court took the basic view that an injury must occur before a cause of action accrues (citing 34 Am Jur, Limitations of Actions, § 160; 54 CJS, Limitations of Actions, § 168). The court continued: "we have concluded that the plaintiff’s cause of action did not arise until the tax deficiency was assessed by the Commissioner of Internal Revenue. Prior to the assessment the plaintiff had not been injured. That is, assessment was the factor essential to consummate the wrong — only then was the tort complained of completed. If a deficiency had never been assessed, the plaintiff would not have been harmed and therefore would have had no cause of action.” (Atkins v Crosland, supra, 417 SW2d, at 153.) Adopting a similar analysis and terming a Federal tax assessment "inherently unknowable” until a notice of deficiency was issued, the Supreme Court of Delaware adopted an Atkins test and noted that there was great sense in using the IRS action as a reference point because "the 'triggering’ of [such a] cause *873 of action depends on the action of a third party” (Isaacson, Stolper & Co. v Artisan’s Sav. Bank, 330 A2d 130, 133 [Del 1974]). These two factors are generally cited in support of applying an Atkins test, and have led courts to utilize the rule irrespective of whether the State involved has a Statute of Limitations based upon accrual, discovery, or even date of damage.
Based upon these factors, all of which militate in favor of New York’s adoption of the Atkins test, this court holds the Atkins test is to be applied to New York claimants and, as to them, that the running of the Statute of Limitations on a claim of negligence and malpractice against an accountant for acts relating to Federal income tax preparation shall commence upon a reference point based on IRS action.
The parties do not present significant arguments to the contrary and their debate is limited to which reference point should be used. The plaintiffs urge that the relevant IRS notice should be the one closest to the current date, while defendants argue in favor of an earlier notice. Precedent clearly exists to support adoption of various points in the IRS processing of a tax dispute as a benchmark.
The administrative process starts with a brief initial deficiency report, an audit, or other examination of books (Louisiana, Harvey v Dixie Graphics, 593 So 2d 351 [1992] [audit meeting used as test date under statute commencing limitation period upon first time of damages, found to be the fees of attorney and accountant attending that meeting]). If there is an unresolved dispute, the second step in the administrative process is known as a "30-day letter,” which will contain specific findings and identify the exact disputes at issue (used as test date in Arkansas, Ford’s, Inc. v Russell Brown & Co., 299 Ark 426, 773 SW2d 90 [1989] [applied without enthusiasm as one of three tests, claim found stale under all views]; Delaware, Isaacson, Stolper & Co. v Artisan’s Sav. Bank, supra, 300 A2d, at 131, 133; Michigan, Seebacher v Fitzgerald, Hodgman, Cawthome & King, 181 Mich App 642, 449 NW2d 673, 676 [Ct App 1989]; Missouri, Brower v Davidson, Deckert, Schutter & Glassman, 686 SW2d 1, 4 [Ct App 1984]; Missouri, Albert v Thornton, 735 F Supp 1443, 1462, affd sub nom. Herman v Grant & Co., 926 F2d 717 [8th Cir 1991]).
After the 30-day letters come administrative appeals, which terminate with a final notice of proposed deficiency, a form known as a "90-day letter,” which is issued approximately 90 *874 days prior to an actual assessment. Although the 90-day letter has been utilized as a reference point, the date of the actual assessment is more typically used as a test date (Alaska, Thomas v Cleary, 768 P2d 1090 [1989]; California, United States v Gutterman, 701 F2d 104 [9th Cir 1983] [attorney malpractice claim regarding tax preparation, applying California law]; Moonie v Lynch, 256 Cal App 2d 361, 64 Cal Rptr 55 [Ct App 1967]; Iowa, Cameron v Montgomery, 225 NW2d 154 [1975] [reference to assessment]; Idaho, Streib v Viegel, 109 Idaho 174, 706 P2d 63 [1985] [reference to assessment]; Maryland, Feldman v Granger, 255 Md 288, 257 A2d 421 [1969] [claim stale even using assessment date]; Maryland, Leonhart v Atkinson, 265 Md 219, 289 A2d 1 [1972] [reference to assessment]; New Mexico, Chisholm v Scott, 86 NM 707, 526 P2d 1300, 1302 [1974] [reference to assessment, noting 26 USC § 6155 (a) (1964)]; North Carolina, Snipes v Jackson, 69 NC App 64, 316 SE2d 657, 659, appeal dismissed 312 NC 85, 321 SE2d 899 [1984]; Texas, Atkins v Crosland, supra [assessment]; Wyoming, Mills v Garlow, 768 P2d 554, 555 [1989] [notice of deficiency]). A settlement prior to the issuance of a 90-day letter is the equivalent of a 90-day letter, for the IRS secures enforcement rights thereby (Mills v Garlow, supra).
Thereafter, payment may be avoided only by commencing an action in Tax Court. Only one case has delayed triggering a Statute of Limitations running until entry of judgment by the Tax Court, where the accountant disagreed with the 90-day letter and advised court action (Florida, Peat, Marwick, Mitchell & Co. v Lane, 565 So 2d 1323, 1326-1327 [1990]).
While the decisions may seem at odds, a close review reveals a consistent approach. A significant majority of jurisdictions have adopted the 90-day notice or the actual assessment date as the brightline test for a Statute of Limitations reference point for the Atkins test as a matter of law, since the legal obligation to pay the claim arises approximately at that time. Nonetheless, and perhaps because of strong advocacy on this point, the reference point may be moved to an earlier or later time based upon specific fact-based reasons.
For example, the cases using the 30-day notice as a benchmark turn upon facts indicating that the taxpayer knew of a clear error early in the IRS process and the issue after that point was at best one of amount, such as in Seebacher v Fitzgerald, Hodgman, Cawthorne & King (supra, 449 NW2d, at 673, 676), where the taxpayer talked to an attorney about the initial explanation of adjustment within two weeks of its *875 receipt and had clear early knowledge of the malpractice, and in Albert v Thornton (supra, 735 F Supp, at 1461), where the Federal court explained that a goodly number of tax problems were disputed and the only debate after the 30-day notice was which items would be found improper. Additionally, several such cases turned upon tax treatments which were entirely inapplicable and utterly erroneous, and which were apparent even prior to the 30-day notice (Brower v Davidson, Deckert, Schutter & Glassman, supra [on examination of corporate accounts]; Ford’s Inc. v Russell Brown & Co., supra [at audit]; Isaacson, Stolper & Co. v Artisan’s Sav. Bank, supra [at audit]). On such facts, the courts found no reason to delay running of the Statute of Limitations. An early Atkins bench-mark in those cases is consistent with the consideration given by New York courts to a showing that a plaintiff was well aware of a claimed wrong (compare, as to fraud claims, Shapiro v Hersch, 182 AD2d 403 [1st Dept 1992], with TMG-II v Price Waterhouse & Co., 175 AD2d 21 [1st Dept 1991] [tax shelter investors failed to display due diligence in relation to discovery of fraudulent acts which were the subject of extensive publicity, until, respectively, an IRS audit or guilty plea to a Federal crime]).
Typically, where such facts exist, rather than seeking out the date that the plaintiffs acquired actual knowledge of the wrong, the courts adopt as a clear benchmark the very next notice issued by the IRS, the 30-day notice. In this context, in relation to the Louisiana case which used an audit meeting date, Harvey v Dixie Graphics (supra), the plaintiff was not the taxpayer, but an indemnitor of tax obligations, and would not have been the recipient of a 30-day notice directly; in any event, were that case to have been litigated in New York, plaintiff’s claim there would have fallen for want of privity with the accountant.
At the opposite end of the spectrum, departure from the general 90-day notice rule is represented by a single case, also involving special facts, in which the running of the Statute of Limitations was postponed until the actual judicial review of the IRS decision. In Peat, Marwick, Mitchell & Co. v Lane (supra), the accountant had assured the taxpayer that the IRS was in error even after the 90-day letter and urged the taxpayer to seek judicial review prior to paying the amount claimed. The Florida court took the view that a plaintiff should not be forced to take inconsistent positions in Federal court on a tax claim and in State court on a malpractice *876 claim, a factor rejected as of no significance in Harvey v Dixie Graphics (supra, 593 So 2d, at 355). Generally, when there are less telling facts than were present in the Florida action, a court reference date has a significant disadvantage for Statutes of Limitation purposes in that these delays are usually generated by the potential plaintiff (see, Feldman v Granger, supra, 257 A2d, at 424-425).
With this Atkins test framework established and a clear recognition that the Atkins test is fact-based, this court turns to the facts of this case. Here, no facts are involved which justify a departure from adopting the 90-day notice as the test date. Any 30-day notices could have done no more than to alert plaintiffs that the legal dispute had come to the IRS’s attention, a danger which had been the subject of Price Waterhouse notices. Indeed, at this point, plaintiffs urge that they relied upon Price Waterhouse’s tacit approval of the use of the Rule of 78’s. On these facts, the 30-day notices placed plaintiffs under no further special obligation to act.
However, by the time of issuance of any 90-day notices, the plaintiffs would have been under a clear obligation to formulate their own independent view and to consider securing individual counsel. This court adopts the 90-day notice as a better test than the assessment date, for it places any taxpayer on notice of the need to consult an attorney to consider either payment or an alternative Tax Court action. The use of the later assessment date is found to be inappropriate since the payment obligation is subject to an automatic stay if a Tax Court action is brought.
Accordingly, as to any plaintiff taxpayer who received a 90-day notice, the 90-day notice is adopted as the Statute of Limitations test date. Because the issue was identical as to every tax year and every partnership, if multiple 90-day notices were directed to one plaintiff, the date of issuance of the first 90-day notice is adopted as the Atkins test date for all claims of that taxpayer. After any first 90-day notice in relation to any partnership, the issue was merely one of the amount of the claim, not whether any claim might lie. As noted above, settlement or payment is equivalent to a 90-day letter, and if any plaintiff did settle or pay sooner, the earliest such date shall be utilized as the Atkins test date. Treating all tax years and partnerships as identical for these purposes is not unduly harsh, since, at that point, such a plaintiff could have asked an independent attorney to review the positions taken by Price Waterhouse, the partnership’s tax counsel, and *877 the IRS, for advice as to whether to pay or not and for an evaluation of the strengths and weaknesses of any possible legal claim against the accountant.
It is factually irrelevant to consider as an Atkins benchmark events after the Tax Court decision of December 1988. Notices following that decision were within three years of commencement of this suit and would not bar any group of plaintiffs.
Based upon the foregoing, an Atkins test appropriate to these facts and the New York plaintiffs is adopted, and the claims of any such plaintiff are held to be stale if such plaintiff more than three years prior to the commencement of this action either (a) received a 90-day notice in relation to any investment in this group of partnerships, or (b) signed a settlement agreement or paid a disputed amount in relation to the Rule of 78’s computation.
The court and counsel have briefly discussed the impact of a contract analysis sometimes used to extend the Statute of Limitations for malpractice claims if the complaint seeks relief appropriate to a contract claim (see, Santulli v Englert, Reilly & McHugh, P. C., 78 NY2d 700 [1992]). A more refined analysis would be required to rule on the issue and, accordingly, plaintiffs are free to raise this question anew at a later date if so advised by counsel.
CONTINUOUS TREATMENT
The second refinement on the general Statute of Limitations rule, to be treated independently, is whether there should be an application of the continuous treatment rule to allow the survival of claims which might be otherwise time barred. Based upon the pleadings and the undisputed record, the application of a continuous treatment toll cannot be justified here.
The court does not ignore that the continuous representation rule is generally available, as a matter of law, to extend both negligence and professional malpractice causes of action. As noted in Alexander & Baldwin v Peat, Warwick, Mitchell & Co. (385 F Supp 230, 237 [SD NY 1974]), "the 'continuous treatment’ rule is applicable in New York to the negligence or malpractice of lawyers, architects and accountants” (see also, Hall & Co. v Steiner & Mondore, 147 AD2d 225 [3d Dept 1989]; Wilkin v Dana R. Pickup & Co., 74 Misc 2d 1025, 1026-1027 [Sup Ct, Allegany County 1973]; Joel v Weber, NYLJ, Apr. 20, *878 1990, at 24, col 3 [Sup Ct, NY County]). Rather, the court concludes the doctrine is inapplicable because the necessary elements are not present to bring it into play on these facts.
The Court of Appeals recently emphasized anew that application of the continuous treatment toll requires the presence of an ongoing corrective effort on the part of the professional which litigation would jeopardize (see, Massie v Crawford, 78 NY2d 516 [1991]). The fact pattern there involved a plaintiff whose doctor had inserted an IUD and monitored the device a number of years before the injury. The Court of Appeals held:
"[Subsequent visits to [the doctor] were for routine * * * examinations, not therapy to correct a medical condition. Consequently, these visits may not serve as a basis for applying the continuous treatment exception because plaintiff could have interrupted the services and switched physicians at any time without jeopardizing her health.
"Here * * * there was no treatment to continue and the plaintiff would jeopardize nothing by instituting suit at any time if she believed defendant guilty of malpractice.” (78 NY2d, at 520.)
The Court reiterated that a mere ongoing client-professional relationship is not sufficient to establish continuous treatment (Massie v Crawford, supra, 78 NY2d, at 419, citing McDermott v Torre, 56 NY2d 399, 405 [1982]; Borgia v City of New York, 12 NY2d 151, 157 [1962]). Clearly, the test is not one solely based upon continuing services or the presence of continued professional trust.
Here, it is undisputed that Price Waterhouse’s role in relation to the Rule of 78’s consisted of discrete annual calculations with the preparation of K-l’s, as well as transmittals of the K-l’s and cover letters to the taxpayers. Such work must be viewed in the same manner as would annual checkups. Accordingly, for Statute of Limitations purposes, plaintiffs fail to persuade that the doctrine is applicable or that consideration of the issue should be deferred for consideration as a mixed issue of fact and law.
Additionally, Price Waterhouse is correct that since the Atkins test has its own allowance for a "treatment” issue, a separate continuous treatment extension is unwarranted. The validity of that position is evidenced by the Florida determination that, where an accountant encouraged a taxpayer to pursue litigation rather than pay, the appropriate Atkins benchmark was the conclusion of the court proceedings recom *879 mended by the accountant (Peat, Marwick, Mitchell & Co. v Lane, supra; see also, recognizing factual issues may be dispositive in some cases, Mills v Garlow, supra). On lesser facts, even where the accountant took an active role before the IRS, no court has adopted a continuous treatment toll. Rather, courts have consistently held such participation was of no significance (see, Brower v Davidson, Deckert, Schutter & Glassman, supra; Snipes v Jackson, supra; Leonhart v Atkinson, supra; Ford’s, Inc. v Russell Brown & Co., supra), although entertaining argument regarding concealment of wrongdoing by the participating accountant (Ford’s, Inc. v Russell Brown & Co., supra). However, concealment is not even arguably applicable here since Price Waterhouse clearly advised plaintiffs of the debate over the Rule of 78’s.
Based upon the foregoing, the court finds the continuous treatment doctrine inapplicable. Other arguments raised by Price Waterhouse in relation to this doctrine are not reached.
INVOLVEMENT OF TAX COUNSEL
Price Waterhouse urges dismissal of the complaint because of the involvement of the partnerships’ tax counsel and its reliance upon such counsel. This position must be rejected as a basis for dismissal for the reasons stated in plaintiffs’ brief, which stresses that the complaint’s lack of elaboration of the role of the partnerships’ tax counsel is not a pleading deficiency.
Because reliance upon counsel is an issue generally raised on a summary judgment motion (see, e.g., Village Bd. v Rattner, 130 AD2d 654 [2d Dept 1987]), this branch of the motion is denied with leave to raise it anew at an appropriate point in time upon a proper showing.
OUT-OF-STATE PLAINTIFFS
 Plaintiffs Huey, Gatewood and Magee are residents of Pennsylvania and Oklahoma, which have two-year Statutes of Limitations for negligence. As to these out-of-State plaintiffs, under New York’s borrowing statute, any shorter limitation period must apply (CPLR 202). If the two-year bar were to be mechanically applied, their claims would clearly be time barred.
The court will assume that the courts of Pennsylvania and Oklahoma would, if confronted with the issue, adopt the Atkins test. Accordingly, the test set forth above for the New *880 York plaintiffs is to be modified to incorporate a two-year bar and adopted with respect to these plaintiffs.
DAMAGES
As counsel consider the course of this case, they should reflect on the proper measure of damages. Three factors, in particular, bear discussion.
First, although an issue may be raised regarding penalty interest, the typical interest paid to the IRS is "not damages * * * but * * * a payment to the IRS for * * * use of the money during the period of time when [the taxpayer] was not entitled to it” (Alpert v Shea Gould Climenko & Casey, 160 AD2d 67, 72 [1st Dept 1990] [fraud claim]). Second, although an accountant cannot "step into the Government’s position” to claim other errors were in the taxpayer’s favor (Wechsler Coffee Corp. v Mahoney, Cohen & Co., 186 AD2d 488 [1st Dept] [a discovery dispute]), attention should be given to the proper calculation of damages considering the tax advantages which were not challenged by the IRS and the increase in deductions for later years. Finally, the Federal court settlement should be examined to ascertain whether it covered any items of damage claimed here.
Accordingly, the motion to dismiss the complaint is disposed of as set forth above. Certain arguments were disposed of by an interim decision of the court, which is incorporated herein to the extent not inconsistent herewith.
Counsel are directed to settle an order, which shall be supported by a stipulation as to any claims found to be time barred upon agreed facts. The normal 60-day time period in which to settle an order is suspended. Counsel are given leave, as requested, to pursue discovery to ascertain any dates of payment or notices relevant to the Statute of Limitations, prior to settlement of an order. The time to move for class action certification shall be specified in the order to be settled and is extended until such order is signed.